1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10
11   MICHAEL VONTRE JAMES,                Case No.  1:12-cv-01583-AWI-SAB (HC)

12                 Petitioner,            FINDINGS AND RECOMMENDATION
                                          REGARDING PETITION FOR WRIT OF
13          v.                            HABEAS CORPUS

14   PAUL D. BRAZELTON,

15                 Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                                          **I.**

20                                    **BACKGROUND**

21

22          Following a jury trial in the Kings County Superior Court, Petitioner was convicted of

23   one count of dissuading a witness (Cal. Penal Code[1]  § 136.1(a)(1)).  Petitioner was sentenced to

24   25 years to life, plus 10 years for committing two prior serious felonies (§ 667.5(a)(1)).

25          Petitioner filed a timely notice of appeal.  On May 2, 2011, the California Court of

26   Appeal, Fifth Appellate District affirmed the judgment.  On July 20, 2011, the California

27

28   _____
     [1] All further statutory references are to the California Penal Code unless otherwise indicated.

Supreme Court denied the petition for review.  Petitioner filed the instant petition for writ of habeas corpus on September 27, 2012.  Respondent filed an answer to the petition on November 30, 2012.  Petitioner did not file a traverse.

## II.

## STATEMENT OF FACTS[2]

In July 2008, Yvonne and her children were harassing Latura.  They threatened Latura and vandalized her car.  One day, Yvonne stabbed Latura in the head and back.  Tikiyie witnessed the stabbing.

Criminal charges were filed against Yvonne.  Latura and Tikiyie were subpoenaed several times by the prosecution.  Each time a subpoenaed [sic] issued, Latura and Tikiyie were harassed by several people.  On approximately 20 separate occasions Tunstall angrily called Latura a "snitch bitch," which is a derogatory term referring to someone who cooperates with the police.  One day in February, Smith's and James's sister, Tenisha, tried to attack Tikiyie while she was sitting in her car.  They yelled and screamed at Tikiyie, calling her a "snitch bitch" and a "police bitch." Tenisha kicked a dent into Tikiyie's car.

On Thursday, April 9, Tikiyie and Latura received subpoenas to appear in court on April 19, 2009.  Tikiyie, Latura and a few of their friends went to a night club on the following Saturday night and Sunday morning.[3]  Tikiyie wore black stiletto heeled boots, a short red dress and a red wig.  Tunstall, Smith, James, Tenisha, and Kevin James were also at the night club.

Tikiyie and her friends went to the bar to get a drink.  Then Tikiyie went by herself into a lounge room and sat down.  Tikiyie testified that Tunstall entered the lounge, looked at her, smiled and laughed, and then left.  Then Smith entered the lounge.  Tikiyie testified that Smith "was loud and obnoxious, calling me snitches and bitches and we're going to get them ho's tonight, and stuff like that." Tikiyie testified Smith was looking at her when she made these statements.  Tikiyie said she just smiled and kept drinking her drink.  Smith left the lounge.

Tikiyie stayed in the lounge room for about 15 minutes and then

---

[2] The Fifth District Court of Appeal's summary of the facts in the May 2, 2011, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

[3] There is conflicting evidence about when the group arrived at the bar.  Latura testified they arrived between 9:30 and 10:00 p.m. on April 11, while Tikiyie testified they arrived at approximately 12:15 a.m. on April 12.

walked into another room containing a dance floor. She passed James, who was standing with a few other people near the lounge room door. Tikiyie began talking to Kenny Martens. Tikiyie testified that Smith approached them. Smith grabbed Marten's arm and said, "Don't be talking to those snitch bitches. I told you about talking to snitches." Then Smith "balled her fist up and hit me in the forehead." Tikiyie said she swung at Smith, "but I don't think I hit her because she kept like swinging at me, and then the next thing I know Michael James grabs my dress from behind, and I fall straight back, and I'm trying to pull my dress down because I didn't have any underwear on." While Tikiyie was on the ground, Smith, James, Kevin and another person repeatedly hit and kicked her. She heard them call her a snitch and a bitch while they were kicking and stomping her. Tikiyie testified that "all I could do is like try to cover my face and try to pull my dress down." Tunstall got involved in the fray. Tikiyie testified Tunstall "acted like he was pulling Demetria Smith off of me, and he socked me … in my temple." Tikiyie testified that the attack continued until a security guard intervened about a minute or two later.[4] The security guard helped Tikiyie get up and escorted her outside. Latura and other people also went outside.

A short time later, Tunstall went outside. Tikiyie testified that Tunstall yelled, "Yeah, I hit that bitch. Yeah, I got that snitch bitch. I bet she won't go to court and testify on that. We're going to have your heads." Tikiyie testified that Tunstall repeatedly called her a snitch bitch and said, "[A]ll you ho's do is tell." Tikiyie was angry and insulted Tunstall. Hanford police officers arrived a few minutes later. Tikiyie said she approached the officers and tried "to explain to them that I had been attacked for no apparent reason, but there "was so much chaos they told me to get in the car and leave" or they would arrest her.

Tikiyie drove to Latura's house, which took about three or four minutes. She "vomited blood" twice during the drive. Latura called 911 but Tikiyie decided the ambulance was taking too long to arrive so she drove herself to the hospital. (Although Latura and several other people were in the car with Tikiyie, none of them had a driver's license.) Tikiyie was vomiting blood and had to pull over to the side of the road. A police officer stopped the vehicle. Latura explained the situation to the officer, who escorted them to the hospital.

Tikiyie was treated in the emergency room and released. Tikiyie complained of a severe headache, nausea and vomiting. She had facial contusions with tenderness over the left temple area. She was tender in the back and upper thoracic region. There was a chip in tooth number eight. Her injuries were consistent with being punched and kicked in the head. Dr. Milton Teske testified that he believed Tikiyie suffered a concussion. Tikiyie did not suffer any acute fractures, bleeding in the brain or serious injury. She was

---

[4] The night club had a surveillance video system with several cameras. CD's containing images of Tikiyie's arrival and of the attack were played for the jury and entered into evidence. Tikiyie testified she was not able to identify James from the images as one of the attackers.

released after being given an anti-nausea medication and Tylenol with Codeine.

Hanford Police Officer Josh Ragsdale interviewed Tikiyie while she was in the hospital.  Tikiyie appeared frightened and disheveled.  Tikiyie told him that she had been attacked by four people.  She identified Smith, Tunstall and Kevin as three of the people who attacked her.  She described the fourth person as a Black male who had dreadlocks and a long beard.  Officer Ragsdale observed noticeable swelling on the left side of Tikiyie's face and a cut on her chin.  He took photographs of Tikiyie's face and hands.  She did not have any lacerations on her knuckles or the backs of her hand.  Officer Ragsdale testified this was consistent with Tikiyie's statement to him that she got "jumped" and had not been in a mutual fight.  Officer Ragsdale spoke with Latura, who said she did not see anything and wanted to stay out of it.

Tikiyie called Hanford Police Detective Gabriel Jimenez the next morning.  Detective Jimenez had investigated the July 2008 stabbing.  He interviewed Tikiyie at the police department.  During this interview, she told the detective that James was one of the people who attacked her.  Tikiyie testified that she wasn't able to remember James's name at the hospital because she "was still in shock from being attacked by men.  It was bad enough being attacked by a woman."  Also, Tikiyie did not personally know James to the same degree as she knew the other defendants.  Detective Jimenez subsequently showed Tikiyie a photo lineup and she identified "the defendants in this case as the attackers."

Tikiyie testified that as a result of the attack she had two black eyes, a chipped tooth, a scar under her lip and her body was really sore all over.  She wasn't able to eat afterwards and lost about 20 pounds.  Also, Tikiyie changed her mind about testifying against Yvonne.  Tikiyie said that she "didn't feel comfortable" testifying, "even though I knew it was going to help my sister."  And Tikiyie was afraid for her children's safety.

Latura testified when they were socializing at the night club, Smith said within her presence, but not directly to her, that "she had her bitches and her niggas in the club."  Later, Latura was on the dance floor when she saw "a fight in the club and my sister she got up, and it was her getting jumped."  Latura went outside and observed a verbal altercation involving Tunstall and others.  Tunstall was angry and he said things "about me going to court, about me getting stabbed, calling me snitches, [calling] my sister snitches, and just say that's how they do them and all this and that, and things like that."

II. Defense Evidence

Tunstsall testified he was on the dance floor when the disc jockey announced that security was needed because there was a fight.  He saw a large crowd surrounding a fight.  Getting closer, he saw Smith on top of Tikiyie.  Kevin and a security guard were attempting to separate the two women.  Tunstall told the security

guard that he could remove Smith. He pulled Smith away from Tikiyie and escorted her off the dance floor. Tunstall testified that he did not hit Tikiyie and no one kicked her. He did not see James near the fight. Tunstall testified that he went outside a few minutes later. Tikiyie, Latura and some other people were yelling and arguing. Tikiyie said some things to him but he did not reply.

Martens testified that he was talking to Tikiyie when Smith approached him and pulled him aside. Smith did not say anything. While his back was turned, Smith and Tikiyie started to fight. Martens saw Tikiyie fall to the ground. Smith got on top of her. The fight stopped when Kevin got in between Tikiyie and Smith, and Tunstall pulled Smith away from Tikiyie. Martens did not see Tunstall punch Tikiyie. Martens said James was standing next to him during the altercation.

Tenisha testified that she saw Tikiyie and Martens talking. Smith approached them and pulled Martens away from Tikiyie. Tikiyie spit on Smith and hit Smith's arm. Tikiyie and Smith started to fight. A crowd surrounded them. Tenisha testified no men were involved in the fight. Tenisha further testified that when she went outside the night club, she saw Tikiyie screaming, swearing and yelling at Tunstall.

Smith called Detective Jimenez, who testified Tikiyie told him that Smith punched her and "they tussled and went to the ground." Tikiyie did not tell him that Smith hit and kicked her while she was on the ground. Detective Jimenez watched the video. He described it as depicting a group of males who appeared to be making kicking and swinging motions at a downward position. The video was not clear and he could not identify any of the subjects.

(Answer, Attachment 1 at 3-8) (footnotes in original.)

## III.

## DISCUSSION

**A.     Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

1   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

2   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

3   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

4   Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is

5   therefore governed by its provisions.

6   **B.    Standard of Review**

7   Where a petitioner files his federal habeas petition after the effective date of the Anti-

8   Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

9   the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

14  28 U.S.C. § 2254(d).  "Federal habeas relief may not be granted for claims subject to § 2254(d)

15  unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly

16  established in the holdings of [the Supreme] Court."  Harrington v. Richter, 562 U.S. 86, 100,

17  131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1); Williams v. Taylor, 539 U.S. 362, 412

18  (2000)).  Habeas relief is also available if the state court's decision "involved an unreasonable

19  application" of clearly established federal law, or "was based on an unreasonable determination

20  of the facts" in light of the record before the state court.  Richter, 562 U.S. at 100 (citing 28

21  U.S.C. § 2254(d)(1), (d)(2)).

22  "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as

23  opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court

24  decision."  Williams v. Taylor, 529 U.S. at 412.  Therefore, a "specific" legal rule may not be

25  inferred from Supreme Court precedent, merely because such rule might be logical given that

26  precedent.  Rather, the Supreme Court case itself must have "squarely" established that specific

27  legal rule.  Richter, 562 U.S. at 101; Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S.Ct. 1411,

28  1419 (2009).  Moreover, the Supreme Court itself must have applied the specific legal rule to the

"context" in which the Petitioner's claim falls.  <u>Premo v. Moore</u>, 562 U.S. 115, 118, 131 S.Ct. 733, 737 (2011).   Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits.  <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S.Ct. 1388, 1398 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Richter</u>, 562 U.S. at 101.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  <u>See</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  <u>Richter</u>, 562 U.S. at 98.

## C.   Review of Claims

### 1.  <u>Sufficient Evidence to Support Conviction for Intimidating a Witness</u>

Petitioner contends that there was insufficient evidence to support the jury's finding that he dissuaded a witness from testifying.  The California Court of Appeal, Fifth Appellate District rejected the claim, stating:

> A.  The witness intimidation verdict is supported by substantial evidence.
>
> James argues his conviction for violating section 136.1, subdivision (a)(1) is not supported by substantial evidence.  We are not convinced.  As will be explained, there is sufficient evidence from which a reasonable trier of fact could find beyond a reasonable doubt that James was guilty of this crime.
>
> When reviewing a challenge to the sufficiency of the evidence, we assess the entire record in the light most favorable to the judgment

below to determine whether it contains substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (People v. Johnson (1980) 26 Cal.3d 557, 578.)  "The standard is the same, regardless of whether the prosecution relies mainly on direct or circumstantial evidence. [Citation.]"  (People v. Vazquez (2009) 178 Cal.App.4th 347, 352.)  The testimony of a single witness is sufficient to prove a disputed fact unless the testimony is inherently or physically impossible.  (People v. Young (2005) 34 Cal.4th 1149, 1181; People v. Scott (1978) 21 Cal.3d 284, 296.)  The trier of fact makes credibility determinations and resolves factual disputes. (People v. Estrella (1995) 31 Cal.App.4th 716, 7254-725.)   An appellate court will not substitute its evaluation of a witness's credibility for that of the fact finder.  (People v. Vazquez, supra, 178 Cal.App.4th at p.352.)  '"Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it.' [Citation.]" (People v. Kwok (1998) 63 Cal.App.4th 1236, 1245.)

Subdivision (a)(1) of section 136.1 prohibits one from knowingly and maliciously preventing or dissuading any witness or victim from attending or giving testimony at any trial or legal proceeding. This section punishes a defendant's "efforts to prevent a victim or witness from appearing in court and giving testimony."  (People v. Fernandez (2003) 106 Cal.App.4th 943, 948.)  It "requires proof that the defendant specifically intended to dissuade a witness from testifying."  (People v. Young, supra, 34 Cal.4th at p. 1210.)

James argues the record lacks proof that he committed any act or made any statement from which it could be inferred that he intended to deter Tikiyie from testifying.  He argues we cannot analyze the evidence for sufficiency under the theory that he dissuaded Tikiyie by actively participating in the attack on her in the night club because the jury acquitted him of assault. Essentially, James claims the negative finding on the assault count is equivalent to a special verdict on the factual question of whether he participated in the attack.  This argument is unconvincing.

An acquittal on one offense will not invalidate a verdict on a second offense, although the two verdicts are factually inconsistent.  This rule is based on the realization that inconsistent findings may be caused simply by the mercy of leniency of the jury, or "through confusion or ennui."  (People v. Pettaway (1988) 206 Cal.App.3d 1312, 1325.)  Thus, for example, in People v. Codina (1947) 30 Cal.2d 356, the jury acquitted the defendant of lewd and lascivious conduct but convicted him of contributing to the delinquency of a minor.  The conviction was upheld even though both counts were based on the same act.  The court wrote that "each count must stand upon its own merit and be weighed separately in its disposition."  (Id. at p. 361; see also People v. Gottman (1976) 64 Cal.App.3d 775, 784-785 [conviction of rape by threats of great bodily harm was affirmed, even though the jury found, in conjunction with an oral copulation charge, that the defendant did not use force or threat of great bodily harm]; People

v. Lopez (1982) 131 Cal.App.3d 565, 569 [not true finding on a firearm arming enhancement is not equivalent to a special verdict on the factual question whether defendant personally used a firearm].)  Thus, the not guilty verdict on counts 3 and 4 are not equivalent to a special verdict that James did not participate in the attack on Tikiyie.  The jury's verdicts on counts 3 and 4 and the not true findings on the great bodily injury enhancements do not have any "bearing upon the meaning or validity of the verdict in other counts, regardless of how similar the facts underlying each county may be.  (Pen. Code, § 954.)"  (People v. Keltie (1983) 148 Cal.App.3d 773, 785, fn. omitted.)

We have examined the entire record and conclude it contains substantial evidence from which a rational fact finder reasonably could determine James knowingly and maliciously dissuaded Tikiyie from testifying.  Tikiyie testified that after Smith called her a "snitch bitch" and hit her on the forehead, James grabbed the back of her dress, causing her to fall on the ground.  Then James and others hit and kicked her while she lay on the ground, trying to pull her dress down.  Tikiyie's testimony that James kicked and struck her is adequate to prove this disputed fact.  (People v. Young, supra, 34 Cal.4th at p. 1181; People v. Scott, supra, 21 Cal.3d at p. 296.)   From the entirety of the circumstances surrounding the attack on Tikiyie, a rational trier of fact could reasonably find that one of the purposes of the beating was to dissuade Tikiyie from testifying against Yvonne, and that James shared the intent and purpose of the other participants in the attack.  The prosecutor asked Tikiyie, "were the people who were attacking you, the defendants, saying anything?"  Tikiyie replied, "They were calling me snitches and bitches, and I just remember hearing snitches bitches, and I remember hearing a lot of like—a lot of like kicking sounds."   Accordingly, we reject James's challenge to the sufficiency of the evidence.

(Answer, Attachment 1 at 21-24.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

On habeas corpus review, a finding of constitutionally-insufficient evidence is rare because the Jackson analysis must be determined through the lens of AEDPA.  Cavazos v. Smith, __ U.S. __, 132 S.Ct. 2, 4 (2011) (per curiam); McDaniel v. Brown, 558 U.S. 120, 133-

1   136 (2010).  When the deferential standard set forth in AEDPA is combined with the already-

2   onerous <u>Jackson</u> standard, the petitioner's burden is exceptionally difficult to carry.  Cf. <u>Renico</u>

3   <u>v. Lett</u>, 130 S.Ct. 1855, 1865 (2010) (finding, in the context of a double jeopardy issue, that

4   "dual layers of deference" result when AEDPA combines with substantive law that is itself

5   deferential); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (applying "double deferential

6   judicial review" to an AEDPA-governed claim brought under the already-deferential standard set

7   forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)).

8        Under California Penal Code section 136.1(a), it is a crime to knowingly and maliciously

9   prevent or dissuade a witness or victim from testifying at a trial or other proceeding.  There is

10  "no talismanic requirement that a defendant must say 'Don't testify' or words tantamount

11  thereto" to be found guilty of witness intimidation; a conviction will be upheld so long as the

12  defendant's "words or actions support the inference" that defendant sought to dissuade a

13  potential witness from testifying.  <u>People v. Thomas</u>, 83 Cal.App.3d 511, 514 (1978).

14       The Court finds that it was not objectively unreasonable for the state courts to conclude

15  that the <u>Jackson</u> standard was met as to each of elements of dissuading a witness.  In July of

16  2008, Tikiyie's sister, Latura Brooks, was being harassed and assaulted by Yvonne Tunstall and

17  her children and criminal proceedings were ongoing.  Latura and Tikiyie had been subpoenaed

18  several times to testify against Yvonne.  Evidence was presented at trial that on the evening of

19  April 12, 2009, as Yvonne's trial was nearing and subpoenas were being issued, Tikiyie and

20  Latura were at the Sky Box bar.  After Tikiyie ordered a drink, Demetria Smith arrived at the bar

21  and began yelling at Tikiyie, "snitch bitches" and "we're going to get that bitch tonight."

22  Sometime later when Tikiyie was talking with Kenny, Demetria Smith approached Kenny

23  Martins grabbed his arm and said, "We don't talk to these snitch bitches.  What are you doing

24  talking to her?  Get away from her," and just as Smith was saying this she reached out and hit

25  Tikiyie on the forehead.  Petitioner then pulled Tikiyie by the back of her dress, causing her to

26  fall to the floor landing on her back.  As Tikiyie was laying on the ground, Petitioner and others

27  repeatedly hit and kicked her calling her a "snitch bitch" and stated "this snitch is not going to

28  make it to court."  (RT 522-523, 525, 557-558, 864-865, 880-881, 1019, 1265-1266, 1302**.)**

1   Yvonne's husband, Corey Tunstall, was also involved in the assault and hit Tikiyie on the side of

2   the head.  He later yelled, "Yeah, I hit that bitch," and told Tikiyie, "I bet you won't make it to

3   court."  (RT 527, 560, 880-881, 1019, 1265-1266, 1302.)

4        After viewing the evidence in the light most favorable to the prosecution, there is little

5   doubt that Petitioner intended Tikiyie to feel threatened if she testified at trial against Yvonne by

6   the very nature of the attack accompanied with the comments of her being a "snitch bitch" and

7   desire that she not be able to testify in court.  Thus, the jury could reasonably have inferred that

8   Petitioner knew Tikiyie had been subpoenaed as a witness and would testify against Yvonne, and

9   he knowingly and maliciously attempted to prevent her from doing so by his participation in the

10  assault coupled with the comments about her testimony.  Therefore, the Court concludes that the

11  state courts' denial of this claim was not contrary to or an unreasonable application of clearly

12  established federal law, nor was it an unreasonable determination of the facts.  See 28 U.S.C. §

13  2254(d).

14        2. Trial Court's Denial of Motion to Reduce Felony Conviction to Misdemeanor

15        Petitioner contends the trial court abused its discretion by refusing to reduce his felony

16  conviction of dissuading a witness to a misdemeanor.  The California Court of Appeal, Fifth

17  Appellate District denied the claim in the last reasoned decision and reasoned as follows:

18          James'[s] probation report reflects that he suffered juvenile
            adjudications in 1986, 1987 and 1989 for, inter alia, possessing
19          stolen property and battery.  As an adult, he was convicted in 1990
            of battery.  He was placed on three years' probation and sentenced
20          to 90 days in jail.  He violated the terms of his probation later that
            year.  In 1991, James was convicted of attempted murder with a
21          firearm.  He was sentenced to 10 years imprisonment and was
            paroled in 1996.  In 1998, he was convicted or robbery and second
22          degree burglary.  He was sentenced to 10 years imprisonment and
            paroled in 2006.  James was on parole when he committed the
23          current crime.  The probation report states that James "showed no
            remorse for the victim and [he] specifically stated, 'don't know
24          what I am being punished for.'"  (Italics omitted.)

25          James filed a motion to reduce his conviction to a misdemeanor
            (the reduction motion) and to dismiss the prior felony convictions
26          in the interest of justice pursuant to People v. Superior Court
            (Romero) (1996) 13 Cal.4th 497 (Romero) (the Romero motion).
27          Both motions were heard and denied during the sentencing
            hearing.  The court explained its reasons for denying the reduction
28          motion, as follows: "… [T]he Court has considered the [§] 17(b)

motion, considered the facts of the case that it heard at trial, as well as those set forth in the report.  [¶]  And while defendant's actions are not as egregious—excuse me, are not as substantial physically as the other two codefendants in this matter, his participation obviously in a crime of this type is egregious.  [¶]  This Court, as stated, has considered it.  It cho[o]ses not to exercise its discretion to make this a misdemeanor given the seriousness of the incident." When ruling on the Romero motion, the court stated that it had considered the factors set forth in Romero, supra, 13 Cal.4th 497, and its sentencing responsibilities under the California Rules of Court, People v. Orin (1975) 13 Cal.3d 937, and People v. Burke (1956) 47 Cal.2d 45.  Then it explained:

And those responsibilities for sentencing are for the Court to take into consideration not only society's purpose in this matter, but before it exercises its discretion to take in the totality of the situations in these matters; not just the conduct in the specific crime in which it is sentencing the defendant.

I note that the age of the defendant's priors, and I note that he has never been off probation or parole since he was a juvenile.  Picking the last juvenile one, it's a battery, a [§] 242.  Even though it's a misdemeanor charge, it shows violence, and his wardship was terminated in January of 1990.

And then one month later he's arrested for another burglary as an adult.  He gets reinstated on probation after a violation of 1991 of March, and less than four months later in July of '91 out of Fresno he has an attempted murder.  He gets paroled November 10th, 1996, and less than two years later, in July of 1998, there's a robbery, violation of [§] 211, as well as a second degree burglary.

He gets put on parole in June 13th of 2006, and less than three years later we have this offense.  I do note that the defendant is 37 years of age, but looking at his record he is a career criminal.  The participation, the jury may have found, has been less than a [§] 136(1) … (c) offense, but these crimes for which he was found guilty are in no means insignificant.

Defendant does face a substantial sentence, but the defendant is, his background, his character, I've considered the letters in his support; however, he cannot be deemed to be outside the spirit of the Three Strikes Law.  If I were to focus strictly on the finding of the jury in this matter, it's quite possible that a middle sentence would be appropriate; however, the Three Strikes Law was put in place by the legislature and by the People of the State of California for the Court to punish recidivism, and before the Court exercises its discretion to strike strikes, it has to take everything into consideration for which I've done."

The crime of dissuading a witness in violation of section 136.1, subdivision (a)(1) may be punished either by incarceration in a county jail or prison for one year.  Section 17, subdivision (b) grants trial courts discretion to treat a crime punishable either as a felony or a misdemeanor, also known as a wobbler, as a

misdemeanor.  Wobblers that are classified as misdemeanors at the time of sentencing do not trigger increased penalties under the three strikes law.  (People v. Superior Court (Alvarez) (1997) 14 Cal.4th 968, 979 (Alvarez).)  Proper exercise of discretion under section 17 involves "an intensely fact-bound inquiry taking all relevant factors, including the defendant's criminal past and public safety, into due consideration; and the record must so reflect." (Alvarez, supra, at pp. 981-982.)  Relevant factors include the defendant's criminal history, "'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.' [Citations.]" (Id. at p. 978.)  On review, we apply "the extremely deferential and restrained" abuse of discretion standard.  (Id. at p. 981.)  "The court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary."  (People v. Myers (1999) 69 Cal.App.4th 305, 310.)

We discern no abuse of discretion.  The trial court stated that it considered the circumstances of the crime and the contents of the probation report.  The probation report included James's criminal history and his attitude towards the offense and offender.  Thus, the trial court made an individualized decision based on an assessment of the factors enumerated in Alvarez, supra, 14 Cal.4th at page 978.  We reject James'[s] assertion that the trial court's remark that his participation "in a crime of this type is egregious" evidence a refusal to "honor[] the spirit of Alvarez."  The trial court did not consider witness intimidation to be per se egregious. It concluded this particular crime was egregious and we agree with this conclusion.  The attack on Tikiyie was a brutal way of dissuading her from testifying.  Tikiyie was publicly beaten by multiple perpetrators in a particularly humiliating manner.  She testified James was one of the men who hit and kicked her while she was on the ground trying to pull down her dress.  James's absence of remorse or empathy for the victim and his substantial criminal history further supports the trial court's decision.  At no point in James's adult life has he been free from probation or parole.  His prior adult convictions involve violent offenses such as attempted murder and robbery.  He was on parole when he committed the current crime.  Denial of the reduction motion was fully supported by the record and we discern no error or abuse of discretion.

(Answer, Attachment 1 at 24-27.)

The role of this Court on federal habeas review of a state criminal conviction is limited to determining whether Petitioner's federal constitutional or other federal rights have been violated and does not extend to review a state's application of its own laws.  Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).  Federal courts must defer to the state courts' interpretation of state sentencing laws.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Bueno v. Hallahan, 988 F.2d

86, 88 (9th Cir. 1993).  Absent a showing of fundamental unfairness, a state court's application or misapplication of its own sentencing laws does not generally justify federal habeas relief. Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).

Under California law, it is a misdemeanor to "knowingly and maliciously prevent[] or dissuade [] any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." Cal. Penal Code § 136.1(a)(1).  It is also a misdemeanor to "attempt[] to prevent or dissuade another person who has been the victim of a crime or who is a witness to a crime from … [m]aking any report of that victimization to any peace officer or state or local law enforcement officer … or to any judge." Cal. Penal Code § 136.1(b)(1).  It is a felony to violate either subsection (a) or (b) by dissuading a witness by force or the threat of force. Cal. Penal Code § 136.1(c)(1).

To the extent Petitioner contends that the trial court improperly exercised its discretion under state sentencing law, such claim is not cognizable on federal habeas corpus review.  See Estelle, 502 U.S. at 67-68.  Thus, this Court's review is limited to whether Petitioner's sentence was fundamentally unfair giving rise to a due process violation.  Christian v. Rhode, 41 F.3d at 469.

In light of the facts of this case as referenced and thoroughly analyzed by the Court of Appeal, with which this Court agrees, it cannot be said that the trial court's denial of Petitioner's motion to reduce his felony conviction to a misdemeanor was fundamentally unfair so as to violate his due process rights.  Thus, the state courts' rejection of this claim was not contrary to or an unreasonable application of federal law.  See 28 U.S.C. § 2254(d).

3. Trial Court's Denial of Romero Motion

Petitioner argues that the trial court abused its discretion by denying his request to strike one or more of his prior strike convictions.  In the last reasoned decision, the California Court of Appeal, Fifth Appellate District denied the claim, stating:

> In ruling on a request to dismiss a prior strike conviction in the interests of justice, the court must conduct a fact-based inquiry to determine whether the defendant falls outside the spirit of the three strikes law.  Relevant factors include the nature of the present offense, defendant's prior criminal history, the defendant's

background, character and prospects, as well as other individualized considerations. (People v. Williams (1998) 17 Cal.4th 148, 161; People v. Philpot (2004) 122 Cal.App.4th 893, 905 (Philpot).) "[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (People v. Carmony (2004) 33 Cal.4th 367, 374.) The burden is on the party attacking the sentence to demonstrate that the lower court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (Id. at p. 377.)

James argues the trial court abused its discretion because it did not give adequate weight to his recent "efforts at law-abiding behavior." James points out that he remained free from criminality from 2006 to 2009, was employed before his arrest, and was in a stable romantic relationship. We are not persuaded. Essentially, appellant is asking this court to reweigh the evidence and substitute our judgment for that of the trial court. This we will not do. (People v. Myers, supra, 69 Cal.App.4th at p. 310.) The trial court is not required to articulate every one of the factors it considered. (Ibid.) The fact that the court focused its comments on James's prior criminal history does not mean this is the only factor it considered. (Ibid.)

The record fully supports the trial court's conclusion that James does not fall outside the spirit of the three strikes law. His criminal history spans over 20 years. It includes violent felonies such as attempted murder and robbery. The current offense involved violence. Probation, parole, short jail sentences and lengthy prison terms have all failed to eradicate his recidivism. James's "conduct as a whole was a strong indication of unwillingness or inability to comply with the law. It is clear from the record that prior rehabilitative efforts have been unsuccessful for [him]." (Philpot, supra, 122 Cal.App.4th at p. 906.) We concur in the trial court's determination that James was not outside the spirit of the three strikes law. Therefore, denial of the Romero motion was not an abuse of discretion. (Id. at p. 907.)

(Answer, Attach 1 at 27-28.)

Petitioner's challenge to the trial court's denial of his Romero motion essentially involves an interpretation of state sentencing law which is not subject to federal habeas corpus review. Wilson v. Corcoran, 562 U.S. 1, 5, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010) (quoting Estelle, 502 U.S. at 67). Thus, this Court's review is limited to whether the application of the sentencing law was fundamentally unfair. Christian v. Rhode, 41 F.3d at 469.

In this case, the sentencing judge declined to strike any of Petitioner's prior convictions after considering all of the relevant factors and applying the applicable state law. Petitioner's

1  criminal history spanned over a period of 20 years which included violent felonies, and he failed

2  to profit from leniency such as probation, parole and short jail sentences.   Therefore, the

3  appellate court reasonably concluded that the sentencing judge's decision that Petitioner did not

4  fall outside the spirit of California's Three Strikes Law was supported by the record.  In light of

5  Petitioner's history, he cannot show that the trial court's refusal to strike any of his prior

6  convictions was fundamentally unfair so as to warrant federal habeas corpus relief.

7       4. Trial Court's Denial of Batson/Wheeler Claim

8       In his final claim, Petitioner challenges the trial court's denial of his Batson/Wheeler

9  motion.  In the last reasoned decision, the California Court of Appeal, Fifth Appellate District

10 found the claim to be without merit and stated the following:

11       Appellants are African-American.

12       Prospective juror No. 389, an African-American male, was in the
         first group of 20 prospective jurors.  The court discussed the daily
13       time schedule and asked the prospective jurors if anyone would
         have difficulty participating.  Prospective juror No. 389 stated he
14       taught a karate class every evening beginning at 5:00 p.m.  The
         court asked him if he would have enough time to get to class if the
15       jury was dismissed at 4:50 p.m.  He replied affirmatively.

16       When prospective jurors were asked to provide occupational and
         educational information, prospective juror No. 389 stated that he
17       was a retired military aircraft mechanic, had two children who
         were both in junior high school, and his wife was employed at a
18       casino.  In response to a question whether the prospective jurors
         had ever been involved in a physical altercation with another
19       person, prospective juror No. 389 replied, "I was attacked one
         time.  I had a guy attack me and I defended myself," using karate
20       skills.  In response to the question whether anyone was injured,
         prospective juror No. 389 replied: "Not severely.  No, he was
21       pretty sore.  I didn't hit him in any place that would actually kill
         him.  I just defended myself, just enough to keep him off of me.
22       That was enough."

23       A total of nine jurors were excused from the first group of 20
         prospective jurors.  Four additional groups, consisting of nine
24       prospective jurors each, were examined and some of the jurors
         were excused.  Prospective juror No. 389 remained.
25
         Prospective juror No. 399, an African-American adult female, was
26       part of the sixth group of prospective jurors.  She stated that she
         was married and had three children.  She was a social worker
27       employed by Kings County Human Services.  Both her husband
         and her oldest son were correctional officers at Corcoran State
28       Prison.  Her other two children were in college.  She has lived in

Kings County for 15 years and had never served as a juror.

After examining the sixth group of prospective jurors, the prosecutor used a peremptory challenge for prospective juror No. 399. He passed on the next five prospective jurors and then used a peremptory challenge for prospective juror No. 389.

Outside the presence of the jury, Smith made a Batson/Wheeler motion. Tunstall and James joined in the motion. Smith's counsel argued the prosecutor had exercised peremptory challenges to excuse three African-American potential jurors. One of these prospective jurors had a son in prison, which could indicate a potential bias against the prosecution. However, in his view there was no reason other than race explaining the decision to excuse prospective juror Nos. 389 and 399. The court found "a prima facie has been made and the burden will shift to [the prosecutor] to explain to the Court the justification for the two challenges."

The prosecutor stated he excused prospective juror No. 399 because "her occupation as a social worker gives me grave concern. It tends to show more of a liberal bias, and that is the, one of the main reasons. [¶] Also the fact that she never has served on jury duty before in this county or any other also is a bias on which I relied upon that gave me cause for concern." The prosecutor stated he excused prospective juror No. 389 for several reasons. His "initial response when we started the day was that he had to be somewhere at 5 o'clock, and he's sat back there most of the day, and my thought maybe his demeanor and his attitude would change as the day went on once he reserved himself to being there, but with every peremptory, he'd lean[] back in the chair, looking up at the ceiling, yawning and his attitude really has not changed throughout most of the day whenever it got closer and closer to being a likely and a potential juror." Next, the prosecutor explained, "I believe … he answered positive to the fact that he's been in physical altercations involving alcohol, and … I think he stated he hasn't served any jury duty as well." Finally, the prosecutor considered "the next jurors in line, and balancing all the factors, and [the next prospective juror] certainly has no prior alcohol physical incidents, [and] he's not a karate instructor who would minimize any violent conduct in the case…."

James's counsel argued that being a karate instructor did not make one a violent person and that prospective juror No. 389 had acted in self-defense during the physical altercation. Smith's counsel argued prospective juror No. 389's physical altercation was not alcohol-related and he was the victim in the incident. Further, Smith's counsel did not think prospective juror No. 389 appeared to be disinterested and, in his view, all of the prospective jurors looked bored and impatient.

The court denied the Batson/Wheeler motion, stating: "The Court has to rule on the adequacy of the justification in this matter. If they're implausible or fantastic justifications, then the Court can find them to be pretext. [¶] In this matter, it appears to this Court that the objections that [the prosecutor] found to [prospective juror

Nos. 389 and 399] are proper in this matter.  [¶] It appears that his reasons were other than … for excusing impermissible group bias or prejudice."

Appellants contend that the prosecutor improperly exercised peremptory challenges to exclude two African-American prospective jurors in violation of "the state Constitution's implicit guaranty of a representative jury, … and, in the federal Constitution, the Fourteenth Amendment's equal protection and Sixth Amendment jury trial provisions."  (People v. Jones (1998) 17 Cal.4th 279, 293.)

In Johnson v. California (2005) 545 U.S. 162, the United States Supreme Court reiterated the three-step process which guides a trial court's constitutional review of peremptory strikes:

First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]"  (Id. at p. 168, fn. omitted.)

A trial court's ruling on a Batson/Wheeler motion is reviewed for substantial evidence.  (People v. Jones, supra, 17 Cal.4th at p. 293.)  "'"'Because Wheeler motions call upon trial judges' personal observations, we review their rulings with "considerable deference" on appeal.'"' [Citation.]  We also bear in mind that peremptory challenges are not challenges for cause—they are peremptory.  We have said that such challenges may be made on an 'apparently trivial' or 'highly speculative' basis.  [Citation.]  Indeed, they may be made "'without reason or for no reason, arbitrarily and capriciously'" [citation]."  (Id. at p. 294.)

In this case, the trial court concluded a prima facie case had been made and the burden shifted to the prosecutor to provide race-neutral reasons for excusing prospective juror Nos. 389 and 399.  The prosecutor stated that he chose to exclude prospective juror No. 399 because she was a social worker and he believed individuals in this occupation were more liberal.  The occupation or employment of a prospective juror is generally a race-neutral reason for excluding him or her.  (People v. Trevino (1997) 55 Cal.App.4th 396, 411-412 [peremptory challenges upheld for individuals employed in social services and health care]; People v. Perez (1996) 48 Cal.App.4th 1310, 1315 [peremptory challenges upheld for individuals who worked in the social services or caregiving fields].)  Also, the prosecutor cited the fact prospective juror No. 399 had never served on a jury before.

The prosecutor set forth several race-neutral reasons justifying his decision to excuse prospective juror No. 389.  First, he was concerned by the prospective juror's demeanor throughout the day.  In addition to expressing concern about scheduling, prospective juror No. 389 appeared disinterested in the proceedings.  Race-

neutral reasons for peremptory challenges often invoke a juror's demeanor, such as nervousness or inattention.  (People v. Lenix (2008) 44 Cal.4th 602, 614.)  "A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons."  (Id. at p. 613.)  When demeanor is cited as a reason for a peremptory challenge, the trial court must evaluate if the prosecutor's demeanor belies a discriminatory intent and if "the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor."  (Id. at p. 614.)  Additionally, the prosecutor was concerned about this prospective juror's involvement in a fight, and the fact he had never served on a jury before.  While the prosecutor made some factual errors about the circumstances of the fight, this does not in and of itself indicate the existence of a racial bias on the prosecutor's part.  The prosecutor explained that he was concerned about the fight because it could indicate this prospective juror might "minimize any violent conduct."

The trial court evaluated the prosecutor's reasons and determined they were genuine and race-neutral.  The court had the benefit of contemporaneous observations of voir dire.  There is nothing apparent from the questions asked by the prosecutor during voir dire which raises the specter of purposeful discrimination.  Since exceptional circumstances do not appear, we defer to the trial court's credibility assessment.  (People v. Lenix, supra, 44 Cal.4th at p. 614.)  Accordingly, we uphold the trial court's ruling and conclude appellants' constitutional jury trial and fair trial rights were not infringed.

(Answer, Attachment 1 at 8-13.)

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).  In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause.  Purkett v. Elem, 514 U.S. 765, 767 (1995) (citing Batson, 476 U.S. at 96-98).  First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race.  Id.  That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race.  Id.  If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge.  Id.  At this second step, "the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's

1  explanation, the reason offered will be deemed race neutral." Id. (quoting Hernandez v. New

2  York, 500 U.S. 352, 360 (1991)).  Finally, the third step requires the trial court to determine if

3  the defendant has proven purposeful discrimination.  And "[s]ince the trial judge's findings in

4  the context under consideration here largely turn on evaluation of credibility, a reviewing court

5  ordinarily should give those findings great deference."  Batson, 476 U.S. at 98, n.21.

6      In this case, Petitioner contends that the prosecutor's reasons were pretextual.  This

7  allegation thus implicates Batson's third step, where the court evaluates whether the defendant

8  has met the burden of showing purposeful discrimination in light of the proffered justifications.

9  Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006) (en banc); Batson, 476 U.S. at 98.  The

10  Court must review the "totality of the relevant facts" which includes the "prosecutor's statements

11  about his jury selection strategies and his explanations … for striking minority jurors" as well as

12  "the characteristics of people he did not challenge." Kesser, 465 F.3d at 360.

13      In order to properly evaluate the prosecutor's reasoning, this Court must conduct a

14  comparative juror analysis which includes side-by-side comparisons of minority venire members

15  who were struck and non-minority venire members allowed to serve.  Jameson v. Runnels, 713

16  F.3d 1218, 1224 (9th Cir. 2013) (federal court must conduct comparative analysis in the first

17  instance if the state court declined to perform it) (citing Briggs v. Grounds, 682 F.3d 1165, 1170

18  (9th Cir. 2012)).  "If a prosecutor's proffered reason for striking a black panelist applies just as

19  well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove

20  purposeful discrimination to be considered at Batson's third step."  Miller-El v. Dretke (Miller-

21  El II), 545 U.S. 231, 241 (2005).

22      This Court's evaluation thus involves comparative analysis in the first instance because

23  the state court declined to do so, and the state court decision must be evaluated in light of the

24  "comparative analysis and any other evidence tending to show purposeful discrimination to

25  decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications

26  to be genuine." Jameson v. Runnels, 713 F.3d at 1225.  As recently stated by the Ninth Circuit,

27  "[t]hough we conduct the comparative juror analysis ourselves, we are still constrained by §

28  2254(d)(2)." Mayes v. Premo, 766 F.3d 949, 960 (9th Cir. 2014) (citing Jamerson, 713 F.3d at

1225-26).   Although the purpose of comparative juror analysis is to assess the prosecutor's credibility, the reviewing court must "also account for the totality of the circumstances . . . and, under AEDPA, give [the state] courts' credibility determination the benefit of the doubt." Mayes, 766 F.3d at 962 (citing Felkner v. Jackson, 562 U.S. 594, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (per curiam); Jamerson, 713 F.3d at 1224).   The writ of habeas corpus should only be granted if the Court finds that "a reasonable appellate court could only reasonably conclude that the [California] trial court's credibility determination was not supported by the record.   Mayes, 766 F.3d at 958 (citing Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004)).

The Court notes that Petitioner's codefendant, Damitra Smith, also filed a federal habeas petition in this district which challenged the composition of the jury under Batson.   See Smith v. Miller, 1:12-CV-00790-LJO-JLT.   On December 9, 2014, Magistrate Judge Jennifer L. Thurston issued a Findings and Recommendation that recommended that Smith's petition be denied.   See 1:12-CV-00790-LJO-JLT, ECF No. 17, Findings and Recommendation.   Magistrate Judge Thurston found that the prosecution offered plausible non-discriminatory reasons for excluding both prospective juror no. 389 and no. 399.   Id. at 11.   Magistrate Judge Thurston also found that Smith had not established that there was purposeful discrimination.   Id.   On March 19, 2015, District Judge Lawrence J. O'Neill adopted Magistrate Judge Thurston's Findings and Recommendation.   See 1:12-cv-00790-LJO-JLT, ECF No. 20, Order Adopting Findings and Recommendation.

### a.  Juror No. 389

The prosecutor provided the following reasons for excusing prospective Juror No. 389 (who was African-American) from the jury: (1) his demeanor and attitude which included leaning back in his chair, looking up at the ceiling and yawning during the parties use of peremptory challenges; (2) prior involvement in a physical altercation; (3) time schedule; (4) lack of prior jury service; and (5) the possibility that he may minimize violent conduct.  (RT 207-208.)

First, a juror's demeanor and behavior during the voir dire process cannot be gauged from a transcript.  Thus, in such situations, federal courts must generally defer to the state trial

1    court's evaluation of whether the prosecutor genuinely relied on the juror's demeanor as the
2    basis for a peremptory challenge.  See Snyder v. Louisiana, 552 U.S. 472 (2008) ("deference is
3    especially appropriate where a trial judge has made a finding that an attorney credibly relied on
4    demeanor in exercising a strike."); Hernandez v. New York, 500 U.S. 352, 365 (1991) ("As with
5    the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and
6    credibility lies 'peculiarly within the trial judge's province.'") (citations omitted).   Here, by
7    finding no discriminatory intent, the trial court impliedly found that the prosecutor's
8    observations regarding Juror No. 389 inattentiveness during the proceedings were legitimate.
9    See, e.g., Jameson v. Runnel, 713 F.3d at 1234 (demeanor observations by the trial court may
10   provide an adequate basis for dismissal.)

11          Furthermore, none of the seated jurors had a potential time conflict.   Juror No. 389
12   clearly stated at the beginning of the voir dire questioning that he taught karate classes every day
13   at 5:00 p.m..  (RT 21.)  Although Juror No. 389 agreed with the trial court that he could attend
14   such classes if released ten minutes prior to 5:00 p.m., this does not dispel the prosecutor's
15   reasonable concern that this juror may be distracted by maintaining his time schedule on a daily
16   basis, particularly given the prosecutor's observation of his inattentiveness to the proceedings.

17          The prosecutor also stated that he was concerned about having Juror No. 389 on the jury
18   because he had been involved in a prior physical altercation, and that he may minimize violent
19   conduct because he is a karate instructor.  (RT 307-308.)  Juror No. 389 indicated that he taught
20   karate classes at night.  (RT 17.)  Based upon the record, none of the seated jurors were involved
21   in martial arts or any activities that would indicate that they minimize violence.

22          However, upon a review of the voir dire transcripts, it appears that Juror No. 389 may not
23   have been the juror who testified that he had defended himself using karate that caused the other
24   individual to be "pretty sore."  (RT 17, 21, 84.)  It may have been Juror No. 184 who testified
25   that he had been in the physical altercation and had used karate which resulted in the other
26   individual being "pretty sore."  (RT 17, 21, 84.)

27          Juror No. 389 and Juror No. 184 were both part of the first group of prospective jurors.
28   (RT 17.)  During voir dire, Juror No. 184 did not indicate to the Court that he was a karate

instructor or that he had experience with karate.  When counsel asked the panel whether anyone

had been involved in a physical altercation, it appears that Juror No. 184 indicated that he had,

but Juror No. 389 did not indicate that he had.  (RT 81-85.)  The following exchange occurred

during voir dire:

> Ms. McGee: Was that—okay. Were there any other hands? You're
> [Juror No. 184's name], correct?
>
> Prospective Juror [No. 184's Name]: Correct
>
> Ms. McGee: Okay. You're the karate instructor. I know that. What
> was your altercation about?
>
> Prospective Juror [No. 184's name]: I was attacked one time. I had
> a guy attack me and I defended myself. That was about it.
>
> Ms. McGee: Okay. Did you use karate?
>
> Prospective Juror [No. 184's name]:  Yes, I did.
>
> Ms. McGee: Did the altercation involve another person or just the
> one person. Was anybody else involved?
>
> Prospective Juror [No. 184's name]: Just that one person.
>
> Ms. McGee: Was anybody injured?
>
> Prospective Juror [No. 184's name]: Not severely. No, he was
> pretty sore. I didn't hit him in any place that would actually kill
> him. I just defended myself, just enough to keep him off of me.
> That was enough.
>
> Ms. McGee: Were you injured?
>
> Prospective Juror [No. 184's name]: I don't think I was.
>
> Ms. McGee: No? But he was just sore?
>
> Prospective Juror [No. 184's name]: Yes, I guess.

(RT 84.) [5]

   During the <u>Batson</u> motion, defense counsel challenged the prosecutor's decision to use

peremptory challenges on Juror Nos. 389 and 399.  (RT 206-207.)  The prosecutor explained that

he used a challenge on Juror No. 389 because Juror No. 389 had been involved in a physical

---

[5] The transcript indicates that Juror No. 184 answered these questions. However, it is possible that the transcript has
the incorrect name for this section of the voir dire, and that Juror No. 389 was actually the one who answered these
questions.

1   altercation involving alcohol and that he was a karate instructor who could minimize violent

2   conduct.  (RT 207-208.)  Petitioner's counsel and Ms. Smith's counsel responded that Juror No.

3   389 had not been involved in an alcohol-related incident, and had only defended himself and did

4   not cause injury.  (RT 208-209.)

5        There are two plausible interpretations of the transcript.  The first option is that the

6   transcript has the incorrect name and that Juror No. 389 actually testified that he had used karate

7   skills on an individual who had attached him and he had caused the other individual to be "pretty

8   sore."  The second option is that the transcript has the correct name and it was actually Juror No.

9   184 who had been in the altercation.

10       For the first option, the Court must determine whether there was innocent, unintentional

11  error or purposeful discrimination by the prosecutor.  See Aleman, 723 F.3d at 982 (citing

12  Batson, 476 U.S. at 98; Mitleider v. Hall, 391 F.3d 1039, 1049 (9th Cir. 2004)).  The Ninth

13  Circuit has held that when a prosecutor mischaracterizes a juror's testimony in a way that is

14  completely contrary to the juror's statements, then the prosecutor's credibility is undermined.

15  Aleman v. Uribe, 723 F.3d 976, 982 (9th Cir. 2013) (citing Jamerson, 713 F.3d at 1232 n. 7;

16  Miller-El v. Dretke, 545 U.S. 231, 243-44, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005)).  However,

17  the prosecutor's credibility is not necessarily undermined when the "prosecutor makes a mistake

18  in good faith, such as an innocent transposition of juror information."  Aleman, 723 F.3d at 982

19  (internal citations omitted).

20       If it was Juror No. 184 and not Juror No. 389 who was involved in the physical

21  altercation, then the prosecutor made a mistake about one of the bases for his peremptory

22  challenge of Juror No. 389.  Petitioner's counsel and Ms. Smith's counsel both indicated that

23  Juror No. 389 had been involved in a physical altercation, so it is possible that all three attorneys

24  misspoke with respect to which juror was involved in the physical altercation, and this leads

25  support for the prosecutor's mistake being merely an innocent transposition.  Therefore, it

26  appears that the prosecutor's mistake was in good faith.  Even if this reason was impermissible, it

27  the prosecutor provided other permissible reasons for challenging Juror No. 389.

28       For the second option, the Court will evaluate the Batson motion as if it was Juror No.

389 who testified that he had used karate skills when he was attacked. Although the prosecutor mischaracterized the circumstances of Juror No. 389's prior physical altercation as involving alcohol, the prosecutor clearly stated that he was concerned that based on Juror No. 389's karate training he may tend to minimize violence. This court is "not convinced that the state court was unreasonable in crediting [the prosecution's] explanation as genuine, particularly affording the double deference due to the state trial court's ruling." Jamerson, 713 F.3d at 1235 (citing Rice v. Collins, 546 U.S. 333, 538 (2006)).

Paneled Juror No. 18 and Alternate Juror No. 198 had been involved in prior physical altercations and had no prior jury experience. Juror No. 18 stated that he was assaulted by three individuals who were ultimately prosecuted by the Navy. (RT at 120.) Juror No. 18 did not state whether there were any injuries or the intensity of the altercation. (RT 120.) Alternate Juror No. 198 stated that he had been in a fight or two just as everyone has and none had taken place within the last ten years. (RT 262.) Therefore, the record was silent about the intensity of the physical altercations and whether any injuries resulted from the altercations involving Paneled Juror No. 18 and Alternate Juror No. 198. In this case, the physical altercation justification is not the strongest, but still permissible because Juror No. 389's physical altercation was more intense than the altercations involving Paneled Juror No. 18 and Alternate Juror No. 198. Even if this reason was impermissible, the prosecutor provided other permissible reasons for challenging Juror No. 389.

Applying the double deference, the Court cannot say that the Court of Appeal's decision, which relied on the trial court's credibility finding, was objectively unreasonable in concluding that the peremptory challenge against Juror No. 389 lacked an impermissible discriminatory motive.

### b. Juror No. 399

The prosecutor explained that he struck Juror No. 399, also African-American, because of (1) her occupation as a social worker; and (2) lack of prior jury service. (RT 207.) Juror No. 399 stated that she was a social worker for Kings County Human Services. (RT 192.) The occupation of a potential juror may be a legitimate non-discriminatory reason to dismiss a

1   potential juror, and a social worker falls within this reasoning.  In this instance, the prosecutor

2   explained her occupation as a social worker tended to show more of a liberal bias which caused

3   him grave concern.  See, e.g., J.E.B. v. Alabama, 511 U.S. 127, 142-143 nn. 14 & 16 (1994)

4   (excusing a potential juror based on occupation may not be constitutional); United States v.

5   Thompson, 827 F.2d 1254, 1260 (9th Cir. 1987) (dismissal of jurors based on occupation is

6   within the prosecutor's prerogative); Messiah v. Duncan, 435 F.3d 186, 200 (2d Cir. 2006)

7   ("full-time social service provider . . . might have more sympathy for a defendant" than other

8   panelists); Hall v. Luebbers, 341 F.3d 706, 713 (9th Cir. 2003) ("Occupation is a permissible

9   reason to defend against a Batson challenge, and being a social worker could be a legitimate

10  basis to strike a prospective juror."); United States v. Smith, 223 F.3d 554, 569 (7th Cir. 2000)

11  (prosecutor's stated reason to strike a potential juror because she was "a social worker type" who

12  would be "too sympathetic towards the defendants" found non-racial.").

13       None of the other seated jurors had jobs involving social work and only two other jurors

14  arguably have a comparable characteristic.  Juror No. 183 was a student studying liberal arts at

15  the time of jury selection and aspired to be a third grade teacher, and had no prior jury service.

16  (RT 194, 198.)  However, Juror No. 183 did not work in the social services field like Juror No.

17  399, and nothing about his education or desire to be a third grade teacher lends itself to being

18  liberal and sympathetic toward the defendants like juror No. 399.

19       Juror No.188 worked as a pastor for a church, which could arguably lend itself to the

20  view of sympathy and forgiveness toward defendants.  (RT 144.)  Juror No. 188, unlike Juror

21  No. 399, had prior jury experience on a drug case.  (RT 147.)  Thus, the prosecutor could have

22  reasonably concluded that Juror No. 188's prior service on a criminal case in which a verdict was

23  reached rendered him suitable as a juror in this case.  Therefore, based on the record, the state

24  court was not unreasonable in concluding that the peremptory challenge against Juror No. 399

25  lacked an impermissible discriminatory motive.

26       Accordingly, after engaging in comparative juror analysis, the totality of the

27  circumstances establishes that the prosecutor's peremptory challenges to Juror Nos. 389 and 399

28  was not unreasonable.  The California Court of Appeal's factual determinations at Batson's third

step relying on the trial court's credibility determinations were not unreasonable.  Also, the California Court of Appeal's decision was not contrary to clearly established federal law.

## IV.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that:

1.  Petitioner's petition for writ of habeas corpus be DENIED; and

2.  The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 17, 2015**

UNITED STATES MAGISTRATE JUDGE